1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVIE B. JACKSON,<br><br>Petitioner,<br><br>v.<br><br>MICHAEL KNOWLES, Warden,<br><br>Respondent. | NO. CV 06-06929-MMM (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the entire file *de novo*, including the Petition; the Magistrate Judge's Report and Recommendation ("R&R"); the Objections to the R&R filed on December 18, 2009;[1] and the records and files. Based upon the Court's *de novo* review, the Court agrees with the recommendation of the Magistrate Judge.

Petitioner states that between June 3 and 4, 2000, detectives continued to question him, even though he had previously invoked his right to remain silent.

---

[1] Respondent did not file a response to Petitioner's objections.

(Objections at 3.)[2] Petitioner also notes that the Court of Appeal referred to the police questioning in passing. (*Id.* (citing Lodged Document ("LD") 8 at 10 ("Detectives managed to elicit some additional information from defendant before terminating the interview.")).) Petitioner contends that this post-invocation questioning violated his constitutional rights. (Objections at 3.)

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

Petitioner invoked his right to remain silent while being questioned by the police in the early morning hours of June 3, 2000. (LD 1 at 457, 504-05.) During the remainder of the interview, Petitioner nonetheless answered the police's additional questions. (*Id.* at 506-11.) The tape of the interview was played to the jury, and a transcript of the tape was given to the jury to assist them in understanding the tape. (LD 4 at 3018.)

Although Petitioner alluded to this questioning in his California briefing (LD 5 at 24 (Court of Appeal opening brief) & LD 10 at 12-13 (California Supreme Court petition for review)), Petitioner did not claim that any statements he made during this questioning should have been excluded at trial. Instead, he challenged only the admission of the statements he made to Jordan, the

---

[2] Although the Court has found the police questions and Petitioner's responses during the interview of June 3, 2000, the Court has been unable to find – and Petitioner has not cited – anything in the record regarding police questioning of Petitioner on June 4, 2000. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

2

1  informant.  (LD 5 at 31-32; LD 10 at 11.)[3]

2      After Petitioner invoked his right to remain silent, the police asked the
3  following questions and Petitioner made the following answers:
4      WHELAN:  Would you like some more water?
5      PETITIONER:  No, I'm not –
6      WHELAN;  Would you like some coffee?
7      PETITIONER:  I don't drink coffee.
8      * * *
9      WHELAN;  You don't want to talk to me anymore?
10     PETITIONER;  No.
11     WHELAN:  Why not?
12     PETITIONER:  Why should I?
13     * * *
14     WHELAN;  Let me ask you one thing about your shoes at the house.  Are
15 those the clothes at the motel, are those all yours?
16     PETITIONER:  Not all of them.
17     WHELAN:  Does it belong to somebody else then?
18     PETITIONER:  Some of them are his, some of them are mine.
19     WHELAN:  Okay.  Any reason why – you said the most money you ever
20 had on you is about twenty – maybe, two hundred bucks borrowed from friends.
21 Is that correct?
22     PETITIONER:  Uh-huh.

---

[3] Although Petitioner never argued to the Court of Appeal that the questioning violated his constitutional rights, he did argue to the California Supreme Court that "in managing 'to elicit some additional information' the detectives violated Mr. Jackson's Fifth Amendment rights." (LD 10 at 14 (quoting LD 8 at 10).)  Although the gravamen of Petitioner's claim in all of his state briefs – and here – was clearly that his statements to the *informant* should have been excluded, this claim was nonetheless arguably exhausted.

3

1   WHELAN: Is there any reason why you would have any more money than
2   that?
3   PETITIONER: Yeah.
4   WHELAN: Why?
5   PETITIONER: Because I sold my car.
6   WHELAN: Not back, that's over a month ago.
7   PETITIONER: (Inaudible).
8   GOLLAZ: We're talking in about the last couple weeks.
9   WHELAN: We're talking about in the last week or so. Is there any reason
10  why you would have anywhere from fifteen hundred to two thousand dollars on
11  your person?
12  PETITIONER: Man, I wish I had that much money.
13  * * *
14  Fifteen hundred to two thousand dollars, you're dreaming.
15  WHELAN: You never had that kind of money, huh?
16  PETITIONER: Never. Never, ever.
17  * * *
18  Never have I had that much money on me, period.
19  * * *
20  GOLLAZ: Is there any reason why you would have blood on your clothing
21  and on your shoes?
22  PETITIONER: I don't see where I would get blood on my clothing 'cause –
23  GOLLAZ: In the last couple weeks, do you know of getting cut or any
24  reason why you would bleed on your own clothing?
25  PETITIONER: On what clothing would that be?
26  GOLLAZ: If the clothing you were wearing in the last week or so?
27  PETITIONER; No.
28

1    GOLLAZ: No, I mean, cut shaving or bloody nose or blood on your shoes,
2 your pants?
3    PETITIONER: I don't know.
4    GOLLAZ: Your shoes?
5    PETITIONER; I don't know.
6    WHELAN: How about that injury on your wrist there. How did you get
7 that?
8    PETITIONER: This here?
9    WHELAN: Yeah.
10    PETITIONER: It was provided by handcuffs that I have been wearing all
11 day.
12    WHELAN: Is that where you got that?
13    PETITIONER: Yeah.
14    GOLLAZ: Let me see your hands.
15    WHELAN: What about this scar right here? That's –
16    PETITIONER: It's kind of old.
17    GOLLAZ: Do you have any cuts on your hands? What happened to your
18 finger here? What's wrong –
19    PETITIONER: It is always there.
20    WHELAN: How did you do it?
21    PETITIONER: It's old. (Inaudible) about fifteen years old.
22    WHELAN: What did you do to injure it?
23    GOLLAZ: Let me ask you this, let me ask you one last question. Is there
24 any reason why you would have Mr. Patton's blood on your clothing?
25    PETITIONER: I don't think I have any clothes with my blood – with his
26 blood on my clothes.
27    GOLLAZ: Okay. But if you did, would there be a reason why that
28 happened?

1         PETITIONER:  I, I guarantee you I have no clothes with any blood on them.
2    Okay?
3    (LD 1 at 505-11.)
4         Thus, in his answers, Petitioner gave the police the following information:
5    (1) some of the clothes at the motel were his, some weren't; (2) he sold his car
6    over a month ago; (3) he never had $1,500 to $2,000; (4) he had no one's blood
7    on his clothing; (5) the handcuffs cut him; and (6) he had a scar that was about
8    15 years old somewhere on or around one of his hands.
9         A *Miranda* violation is subject to harmless error analysis.  *Arizona v.*
10   *Fulminante*, 499 U.S. 279, 295-96, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).
11   An error is harmless unless it had a "substantial and injurious effect or influence
12   in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113
13   S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  The error here is harmless for several
14   reasons.  First, Petitioner has not identified any statement he made that was
15   incriminating or would have influenced the jury's verdict.  There is essentially
16   nothing he said after he invoked his right to remain silent that would have had any
17   effect on the jury's verdict.   Second, part of what Petitioner said was a repetition
18   of what he said during the initial part of the interview *before* he invoked his right to
19   remain silent.  Petitioner said he sold his car a month ago for $1,500, although
20   the person who bought it still owed him some money.  (LD 1 at 465, 489, 502.)
21        Third, during closing argument, the prosecutor did not rely on anything
22   Petitioner said during the final part of the interview in his opening summation and
23   made only one reference in his rebuttal.  In the opening summation, the
24   prosecutor referred to the police interview three times, but each involved
25   statements Petitioner made *before* he invoked his right to remain silent.  (LD 4 at
26   3621 (referring to LD 1 at 461-62); LD 4 at 3633 (referring to LD 1 at 492-93); LD
27   4 at 3644-45 (referring to Petitioner's demeanor during the interview and
28   specifically LD 1 at 463).)  In rebuttal, the prosecutor referred to the police

interview twice.  The second reference was to Petitioner's demeanor before he invoked his right to remain silent.  (LD 4 at 3742 (referring to LD 1 at 496).)  The prosecutor made only one reference to Petitioner's statements *after* he invoked his right to remain silent.  According to the prosecutor, when Petitioner was asked about the blood on his clothing and shoes, Petitioner told the police:  "I guarantee you, I have no clothes with any blood on them."  (LD 4 at 3729-30 (referring to LD 1 at 511).)  The prosecutor then argued:  "He never mentions the shoes.  He never says, I don't have any shoes with blood on them."  (LD 4 at 3730.)  However, this single reference to Petitioner's statement was not likely to have had a substantial effect on the jury's verdict for several reasons.  First, the police questions about Petitioner's shoes had come earlier, and Petitioner said he knew of no reason why there would be blood on his shoes.  (LD 1 at 509-10.)  Second, Petitioner's statement about clothes was in response to Detective Gollaz's questions that were *only* about the clothes.  (*Id.* at 510-11.)   Third, the jury was already aware of the physical evidence involving the Nike boots.  The prosecutor argued that the boots had Albert Patton's blood in them, that the boots were found in the motel room, that Jordan said the boots belonged to Petitioner, that Petitioner's girlfriend said the boots belonged to Petitioner, that in the wire tape Petitioner was "really concerned about those boots," and that Petitioner wore a size 12 (the same size as the boots).  (LD 4 at 3622-23.)

In sum, the admission of the few statements made by Petitioner after he invoked his right to remain silent was harmless.

Petitioner's remaining objections are without merit.

IT IS ORDERED that the Report and Recommendation is adopted, and that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: June 30, 2010

_____
MARGARET M. MORROW
United States District Judge